**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOSHUA RIAUBIA, individually and on behalf of all others similarly situated, | : : : : | CASE NO.: |
| Plaintiff, | : : | |
| v. | : : | CLASS ACTION COMPLAINT |
| HYUNDAI MOTOR AMERICA, | : : | |
| Defendant. | : : : : : : : | JURY TRIAL DEMANDED |

Plaintiff, Joshua Riaubia ("Plaintiff"), by his designated attorneys, individually and on behalf of all others similarly situated, for his Class Action Complaint, alleges as follows based on personal knowledge, investigation of counsel, information and belief, and publicly available information:

<u>**NATURE OF THE ACTION**</u>

1.    This is a class action against Defendant, Hyundai Motor America ("Defendant" or "Hyundai"), arising from its failure and inability to deliver to consumers vehicles equipped with non-defective "Smart Trunks."  As a result, Hyundai: (a) breached its express and implied warranties; (b) violated consumer protection, unfair competition, and false advertising laws; and (c) was unjustly enriched.

2.    The Smart Trunk ("Smart Trunk"), which Defendant first made available on its model-year 2015 vehicles, is a proximity-activated trunk lid. Specifically, the trunk can be opened by standing directly behind the vehicle with the vehicle's key fob in one's hand, pocket, or purse. The key fob automatically sends a radio signal to the vehicle that tells it to open the trunk – no buttons on the key fob need to be pressed.

3.      Defendant has aggressively promoted the Smart Trunk as a "hands-free" feature that automatically opens the trunk fully, or at least wide enough for a person to deposit bulky items into the trunk – such as shopping bags, duffle bags, and sports equipment – without having to put the items down or manually open the trunk lid.

4.      Contrary to Defendant's representations, the Smart Trunk is defective in that it will frequently fail to open more than a few inches. Indeed, Defendant has sold and leased countless vehicles, including one to Plaintiff, equipped with defective Smart Trunks that never open more than a crack. Instead of automatically opening as advertised, they simply unlatch, requiring consumers to manually push open the trunk lid, thereby failing to provide the "hands-free" convenience the Smart Trunk is advertised to deliver.

5.      Defendant has breached its express warranty obligations under Pennsylvania law because it has failed to deliver conforming, non-defective Smart Trunks to Plaintiff and Class members despite, in many cases, multiple repair attempts.  Moreover, Defendant breached the implied warranty of merchantability because the Smart Trunks sold and leased to Plaintiff and Class members were defective at the time they left the exclusive control of Defendant.

6.      Defendant is a California corporation and its false and deceptive advertisements violate California consumer protection, false advertising, and unfair competition laws. Defendant has further violated these laws by knowingly failing to disclose material facts about the Smart Trunks to consumers. Namely, Defendant has failed to inform Plaintiff and Class members that the Smart Trunk does not open as wide as depicted in advertisements and that it possesses a defect that, in many cases, prevents the trunk from opening to any appreciable or useful degree.

7.      This suit is brought on behalf of Plaintiff and all other purchasers and lessees of Hyundai vehicles equipped with Smart Trunks ("Vehicles") for breach of express and implied warranties under Pennsylvania law, violations of the California Unfair Competition Law, the California False Advertising

Law, the California Consumer Legal Remedies Act, violation of the Magnuson-Moss Warranty Act, and unjust enrichment.

8.      As a result of these violations and breaches, this action seeks damages; restitution; restitutionary disgorgement; replacement and repair, and other actual, consequential, and incidental damages; punitive damages; interest; reasonable attorneys' fees and costs; and any other relief the Court deems just and appropriate.

## PARTIES

9.      Plaintiff is a natural person and a citizen of the Commonwealth of Pennsylvania. He purchased a 2015 Hyundai Sonata Limited in August of 2014.

10.      Defendant is a California corporation with its principal place of business at 10550 Talbert Ave., Fountain Valley, California. Defendant, thus, is a California citizen. Upon information and belief, Defendant is a wholly owned subsidiary of Hyundai Motor Company and is responsible for U.S. operations such as the design, manufacture, testing, marketing, and distribution of Hyundai vehicles.

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because there are more than 100 proposed Class Members, some members of the proposed class and the Defendant are citizens of different states, and the amount in controversy exceeds $5 million.

12.      The Court has personal jurisdiction over Defendant because Defendant has sufficient minimum contacts with Pennsylvania such that the exercise of jurisdiction by this Court is consistent with notions of fair play and substantial justice. Defendant routinely conducts business in Pennsylvania and otherwise avails itself of the protections and benefits of Pennsylvania law through the advertising, marketing, distribution, and sale of its Vehicles in Pennsylvania, and this action arises out of or relates to these contacts.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant is a resident of this District within the meaning of 28 U.S.C. § 1391(c)(2); Defendant advertises, markets, distributes, sells, and leases Vehicles in this District, Plaintiff resides in this District, and a significant number of acts complained of herein occurred in this District.

**FACTUAL ALLEGATIONS**

a.     **"Smart Trunk" Background**

14.     The Smart Trunk, first introduced in 2015 Hyundai models which went on sale in 2014, is a feature on certain Hyundai automobiles that is advertised by Defendant as allowing consumers to open their trunks "hands-free" and without pushing any buttons.

15.     Without limitation, the Smart Trunk comes standard on the following Hyundai Vehicles: the 2015 Sonata (Sport, Limited, and Sport 2.0T);[1] 2015 Azera (all trims); 2015 Genesis (all trims); 2016 Sonata (Limited, Sport 2.0T, and Limited 2.0T); 2016 Azera (all trims); 2016 Genesis (all trims); 2017 Elantra (Eco and Limited); and the 2017 Sonata (Limited and Limited 2.0T).

16.     Without limitation, the Smart Trunk is an available option on the following Vehicles: the 2015 Sonata (Eco), 2016 Sonata (Sport), 2017 Sonata (Sport), and the 2017 Elantra (SE). To add the Smart Trunk to these Vehicles, consumer must pay for an upgrade package which, depending upon the Vehicle, costs between $950 and $1,900, a significant portion of which is attributable to the Smart Trunk feature.[2]

17.     Defendant designed the Smart Trunk to be opened by standing directly behind the Vehicle with the Proximity Key (also called a Smart Key) in one's hand, pocket, or purse. The Proximity Key is a key fob that automatically transmits a radio signal which, among other things, activates the Smart Trunk feature. For the trunk to open, the user must stand 20-40 inches behind the Vehicle for at least three

---

[1]     Terms such as "Sport" and "Limited" describe the "trims" available for a particular vehicle model. Different trims frequently have different vehicle body designs, standard features, and/or optional features.
[2]     In addition to the Smart Trunk, the upgrade packages may include, *inter alia*, heated seats, blind spot detection, and chrome exterior door handles.

seconds. The hazard lights blink and a chime sounds multiple times, notifying the user that the trunk is about to open. If the user does not want the trunk to open, they can press any button on the Proximity Key or step outside of the "proximity zone" at any time during the three-second countdown.

18.     After the three-second countdown, the trunk latch is automatically released, which is supposed to allow tensioned metal bars (referred to by Defendant as "torsion bars") and/or springs in the trunk to open the trunk lid approximately half-way.

19.     The Smart Trunks in the Elantra, Sonata, and Azera do not use electronic trunk motors or similar components to assist in opening the trunk lid. The Genesis, however, can be outfitted with a "Power Trunk Lid" which uses an electronic motor to fully open the lid. The Power Trunk Lid is optional; it is part of a $3,500 "Ultimate Package" for the Genesis. If a consumer does not purchase the Ultimate Package, their Genesis will have a Smart Trunk that operates using the same torsion bars and/or springs as in the other Vehicles.

**b.     Defendant Markets the Smart Trunk as a "Hands-Free" Feature**

20.     Defendant, through an extensive marketing campaign, has promoted the Smart Trunk as a "hands-free" feature that automatically opens the trunk lid at least half-way; wide enough to easily fit in bulky items such as shopping bags, duffel bags, and sports apparel. Indeed, Defendant has even claimed, through images and videos, that the Smart Trunk opens the trunk lid fully.

21.     Defendant has published marketing materials and advertisements pertaining to the Smart Trunk on the Internet, in magazines, and on television. Upon information and belief, these advertisements and marketing materials have been viewed by millions of American consumers.

22.     On its website, www.hyundaiusa.com, Defendant has aggressively promoted the Smart Trunk as an "exclusive," "must- have" feature for not only "serious shoppers" and those with active lifestyles, but for everyone else as well.

23.     For instance, an advertisement in the "Why Hyundai" section of Defendant's website depicts a man holding a basketball in his right hand and a gym bag in his left hand. He is standing behind a Hyundai, and the trunk is open approximately half way – wide enough for him to easily place his items inside. *See Figure 1, infra.* The tagline of this picture is "More comfortable. More convenient. More better." The accompanying text states:

> How well a vehicle caters to you can make the difference between a car you like and a car you love. So we go the extra mile to make sure you're well taken care of . . . Our hands-free smart trunk opens automatically when it senses your key fob approaching.



*Figure 1: Website Advertisement 1 – All Models.[3]*

24.     Similarly, an advertisement in the "Compare Hyundai Sedans" section of Defendant's website depicts a woman carrying a large container with both her hands. She is approaching a Hyundai Vehicle, and the trunk is fully open. The tagline states, "Available hands-free smart trunk." *See* Figure 2*, infra*.

---

[3]     *Technology and Innovation*, Hyundai USA, https://www.hyundaiusa.com/new-thinking/innovation-technology.aspx (last accessed Aug. 7, 2016).



*Figure 2: Website Advertisement 2 – All Models.[4]*

25.     Defendant has made similar representations for each individual Vehicle for which the Smart Trunk is available. Indeed, Defendant has widely used images and language that are the same as, or substantially similar to, the foregoing. For example, the man holding the basketball and gym bag and the woman appear in multiple advertisements, and in each graphic their hands are full and the trunk is frequently fully open or half-way open. Moreover, Defendant touts the Smart Trunk's convenience in each advertisement and nearly universally refers to it as a "hands-free" feature.

26.     For instance, an advertisement featuring the woman – and the wide open trunk –appeared on Defendant's website in 2015 and 2016. This advertisement, which was for the Smart Trunk in the 2016 Sonata, proclaimed, "Two big thumbs up for two exclusive features." Underneath this tag line, the following statements appeared:

>       The available hands-free smart trunk makes loading and unloading your Sonata very convenient. It opens automatically when it senses the Proximity Key is behind the vehicle within three feet for more than three seconds.[5]

---

[4]     *Compare Hyundai Sedans,* Hyundai USA, https://www.hyundaiusa.com/vehicle-lineup/sedans.aspx (last accessed Aug. 7, 2016)

[5]     *2016 Hyundai Sonata*, Hyundai USA, https://web.archive.org/web/20160112222102/https://www.hyundaiusa.com/sonata/comparison.aspx (last accessed August 7, 2016).

27.     The advertisement also asserted that the "Class-exclusive smart trunk" is not available on the Nissan Altima, Toyota Camry, or Honda Accord. *See Figure 3.*





*Figure 3: 2016 Sonata Smart Trunk Advertisement.[6]*

28.     The man holding the basketball and gym bag currently appears in at least four advertisements for the Elantra on Defendant's website. In one advertisement, the trunk is fully open and the tagline proclaims, "Here's a segment-exclusive feature that's truly applause-worthy." Under the tagline, it states:

> Elantra is the only vehicle in its class to offer an available hands-free smart trunk. When you're loaded down with boxes and bags, you'll love how it helps out. It's a must-have feature for serious shoppers everywhere, but especially handy in the parking lot.

---

[6]      *Id.*

29.     The advertisement goes on to state that the "Segment-exclusive Hands-free smart trunk" is not available on the Toyota Carolla, Chevy Cruze, or the Honda Civic. See *Figure 4*.





*Figure 4: Elantra Smart Trunk Advertisement.*[7]

30.     The other three advertisements featuring the man holding the basketball and gym bag show the trunk at least half-way open, and they tout the exclusivity and convenience of the Smart Trunk. In one graphic, the tagline declares, "Hands full? We'll get that." Underneath, the advertisement states:

> Everybody has stuff. Stuff that needs to be carried from here to there and back again. So loading becomes a problem. But for a moment you can transcend all of that with Elantra's hands-free smart trunk. Let's face it, the only thing worse than juggling your bags and boxes is putting all of that stuff down to reach for your key-that is annoying. A better trunk should work for you, not create more work for you. Automatic and so

[7]        *2017 Hyundai Elantra, Compare Compact Cars*, Hyundai USA, https://www.hyundaiusa.com/elantra/comparison.aspx (last accessed August 7, 2016).

convenient, it requires no gestures. No buttons. The Elantra senses your
presence and the trunk opens posthaste.[8]

31.     Another advertisement reiterates that the "hands-free smart trunk" is available on the Elantra
but not the Honda Civic. It further states that the Elantra's Smart Trunk "opens automatically" and that
"loading your Honda Civic won't be as easy because this feature is not offered."[9]

32.     The final advertisement featuring the man holding the basketball and gym bag promotes the
"Hands-free smart trunk" as being "exclusive in its class" and a feature that "makes loading and unloading
your Elantra more convenient. The hands-free smart trunk opens automatically when it senses the
Proximity Key is behind the vehicle within three feet for approximately three seconds or longer."[10]

33.     Defendant has used language virtually identical to that in the previous paragraph in other
advertisements, such as various graphics promoting the Sonata.[11] One such advertisement promoting the
2015 Sonata appeared on Defendant's website in 2014.[12]

34.     Defendant promoted, and continues to promote, other Smart Trunk equipped Vehicles,
including without limitation the Azera and Genesis, on its website with equal vigor. Many of these
advertisements depicted the Vehicle with its trunk wide open, and almost all of them explicitly referred to

---

[8]      *2017 Hyundai Elantra*, Hyundai USA, https://www.hyundaiusa.com/elantra/index.aspx (last accessed August 7, 2016)
(hereafter "'We'll Get That' ad").
[9]      *Compare the Hyundai Elantra vs. the Honda Civic*, Hyundai USA, https://www.hyundaiusa.com/compare/elantra-vs-civic/?cmpid=RF_SM_YouTube_2x8q3x3160315815 (last accessed Aug. 11, 2016).
[10]     *2017 Hyundai Elantra, Exterior Features & Designs*, Hyundai USA,
https://www.hyundaiusa.com/elantra/exterior.aspx (last accessed Aug. 7, 2016)
[11]     *2016 Hyundai Sonata*, *supra* note 5; *2017 Hyundai Sonata Featuring Android Auto,* Hyundai USA,
https://www.hyundaiusa.com/sonata/technology.aspx (last accessed Sept. 13, 2016); *Sonata Technology*, Hyundai USA,
https://web.archive.org/web/20140804143617/https://www.hyundaiusa.com/sonata/technology.aspx (last accessed September
13, 2016) (promoting the 2015 Sonata).
[12]     *Sonata Technology*, *supra*. ("Hands-Free Smart Trunk: Exclusive In Its Class. This available feature makes loading
and unloading your Sonata more convenient. The hands-free smart trunk opens automatically when it senses the Proximity Key
is behind the vehicle within three feet for more than three seconds."). *See also Android Auto - Now Available Only in the 2015
Hyundai Sonata,* Hyundai USA,
https://web.archive.org/web/20150908001327/https://www.hyundaiusa.com/sonata/technology.aspx (last accessed September
13, 2016) (advertisement with identical text promoting the 2015 Sonata which appeared on Defendant's website in 2015).

the Smart Trunk as "hands free." Indeed, in every Smart Trunk ad that pictures a Genesis with its trunk open, the trunk is open fully.

35.     For example, an advertisement for the 2015 Genesis showed a picture of the Vehicle with its trunk fully open. *See Figure 5.* Underneath the tagline "Hands-Free Smart Trunk With Auto Open," the advertisement declared:

> Can a trunk be smart enough to know when your hands are full? The Genesis' hands-free trunk will automatically open when you stand within three feet behind the vehicle with the key for more than three seconds. No need to kick or waive your foot to engage.



*Figure 5: 2015 Genesis Smart Trunk Advertisement.*[13]

36.     An advertisement for the 2016 Genesis, which currently appears on Defendant's website, is virtually identical to the foregoing. Moreover, another advertisement for the 2015 Genesis used the same

---

[13]     *Hyundai Genesis 2015 – Review Specs Features & Prices,* Hyundai USA, https://web.archive.org/web/20150405020210/https://www.hyundaiusa.com/genesis/technology.aspx (last accessed Aug. 7, 2016).

picture as above, but contained different text; it asserted that the Genesis has "World-First Technology That Puts You First," and stated, "From a trunk that knows when your hands are full, to sensors that know when you need fresh air, every detail has been considered, all with the goal of putting you first."[14]

37.     Similarly, an advertisement for the "Hands-free Smart Trunk with Auto Open" on the 2016 Azera states, *inter alia*, that the feature is "class-exclusive" and "makes loading and unloading your Azera easier." It also contains a picture of the back of an Azera with superimposed images of the trunk lid, demonstrating that it opens at least half-way; wide enough to easily fit bulky items inside such as shopping bags and backpacks. *See Figure 6.*



*Figure 6: 2016 Azera Smart Trunk Advertisement.*[15]

38.     Another image promoting the Smart Trunk on the 2016 Azera appears on Defendant's website. The tagline states "Hands-Free Smart Trunk: Say No to Dumb." To the right of the tagline it says:

---

[14]     *The 2015 Hyundai Genesis – The Best Premium Luxury Sedan*, Hyundai USA, https://web.archive.org/web/20140702175857/https://www.hyundaiusa.com/genesis/comparison.aspx (last accessed August 7, 2016).
[15]     *2016 Hyundai Azera – Technology*, Hyundai USA, https://www.hyundaiusa.com/azera/technology.aspx (last visited Aug. 7, 2016).

> Enjoy Convenience that only Azera offers. No other car in its class offers this must-have feature- and it's standard on Azera. The hands-free smart trunk opens automatically when it senses the Proximity Key is behind the vehicle within three feet for more than three seconds.

39.    The advertisement also claims that the Nissan Maxima's trunk is "Not as Easy," that the Toyota Avalon has a "Dumb Trunk Only," and that the Lexus ES 350 has "Low Trunk IQ." Moreover, the advertisement includes a picture of an Azera with arrows pointing up from the trunk to the top of the rear windshield, implying that the Smart Trunk automatically opens the trunk lid all of the way. *See Figure 7.*



*Figure 7: 2016 Azera Smart Trunk Advertisement 2.*[16]

---

[16]     *2016 Hyundai Azera – Mid-Size Sedan*, Hyundai USA, https://www.hyundaiusa.com/azera/comparison.aspx (last accessed Aug. 7, 2016).

40.     An identical advertisement appeared on Defendant's webpage for the 2015 Azera.[17]

41.     In addition to aggressively advertising the Smart Trunk on its website, Defendant has fervently promoted it on social media. For instance, Defendant posted a video advertisement to its verified Facebook and Twitter accounts in May and July of 2016, respectively.[18] In the video, numerous phrases flash across the screen such as "New," "Brand-New," and "Exceptionally-New." Shortly thereafter, the phrase "How About Better?" appears, followed by "Hands-Free Smart Trunk." While the latter phrase is displayed, the trunk of an Elantra pops fully open, as shown in *Figure 8.*



*Figure 8: Facebook and Twitter Video Advertisement.*[19]

42.     At the end of the video, the following is displayed: "The 2017 Elantra. Not Just New. Better."

43.     Defendant's Facebook and Twitter accounts are "public," meaning that a consumer does not have to be the Defendant's "friend" or "follower" on Facebook or Twitter, respectively, to view a video or

---

[17]     *See 2015 Hyunda Azera – Overview,* Hyundai USA, https://web.archive.org/web/20150319000812/https://www.hyundaiusa.com/azera/comparison.aspx (last accessed August 7, 2016).

[18]     A "verified" Facebook belongs to the creator, brand, business, or organization it is represented as belonging to.

[19]     Hyundai, Facebook (May 19, 2016, 2:40am), https://www.facebook.com/Hyundai/videos/10153655257338753/?permPage=1; Hyundai USA, Twitter (July 19 2016, 12:00 pm), https://twitter.com/Hyundai/status/755477361898971137.

post. As of the date this Complaint was filed, the foregoing video has been viewed over 2.5 million times on Facebook alone.

44.     In a video posted to Defendant's verified YouTube channel, a woman is giving a "360-degree tour" of the Elantra's exterior. When she gets to the rear of the Vehicle, she exclaims:

> One of my favorite features is the Smart Trunk. Now if I am standing near the trunk and I have the keys on me, I just have to be near it for three seconds and the trunk automatically opens. I don't know about you but this is something that I could really get used to!

45.     While she is talking, the trunk automatically opens approximately half way.[20]

46.     Defendant's YouTube channel is public, meaning that anyone can view any of the videos it posts. As of the date this Complaint was filed, the foregoing video had approximately 1000 views.

47.     In another Youtube video, a man who identifies himself as Miles Johnson and as being "with Hyundai Motor America" demonstrates the operation of the Smart Trunk on the Hyundai Sonata.

48.     Upon information and belief, Miles Johnson is the Senior Public Relations Manager at Hyundai Motor America.

49.     In the video, Mr. Johnson states:

> So I've got a bunch of objects in my hands here. Obviously my hands are pretty full, and it would be difficult for me to get into my pocket and get my key fob out to open the trunk. So Hyundai's designed the Smart Trunk, so just take a look at how it works.

50.     Mr. Johnson then walks up to the rear of the Vehicle with a large bag in one hand and a smaller object in the other. When he gets close to the trunk, the hazard lights blink and chimes sound, in unison,

---

[20]     HyundaiUSA, *360 Exterior Tour 2017 Hyundai Elantra – Not Just New. Better*, YouTube (Jul 8, 2016), https://youtu.be/R-c5Xlmdcy0 .

four times. The trunk then automatically opens approximately half way, as shown in *Figure 9*. Mr.

Johnson then states, "And you can see I can easily put my objects in."



*Figure 9: Smart Trunk Demonstration Video with Miles Johnson.*[21]

51.     As of the date of this Complaint, the foregoing video had over 3,500 views on

YouTube.

52.     In another video appearing on Defendant's verified YouTube account, a woman asks,

"Can a trunk be opened when your hands are full?" The woman continues:

> If you are driving a 2015 Genesis, the answer is yes. Every Genesis comes
> standard with a hands-free smart trunk that automatically opens when you
> stand within three feet behind the vehicle with the key for more than three
> seconds. And the best news:  there's no need to kick or waive your feet to
> get the trunk open."

---

[21]     AUTO Connected Car News, *Hyundai Sonata smart trunk opens when you stand by it*, YouTube (Sept. 12, 2014), https://www.youtube.com/watch?v=QSJKF52pEhI .

53.     The woman then approaches the rear of the Vehicle with large canvas bags filled with groceries in each hand. The trunk automatically opens fully, untouched by the woman, and she easily places her bags in the trunk. *See Figure 10.*



*Figure 10: Genesis Smart Trunk Video.*[22]

54.     At the end of the video, the woman declares, "The hands-free smart trunk on the 2015 Genesis; it's another way Hyundai is using technology to make our vehicles more versatile for you."

55.     As of the date this Complaint was filed, the foregoing video had over 14,000 views on YouTube.

56.     Another video, featuring Ricky Lao, Senior Product Manager at Hyundai Motor America, has over 13,000 views on YouTube. As in the previously-discussed video, this video depicts the "hands-free" Smart Trunk on the Genesis opening fully.[23]

---

[22]     Hyundai USA, *2015-2016 Hyundai Genesis | Smart Trunk*, YouTube (Jan. 6, 2015), https://www.youtube.com/watch?v=d1wAM9S3gko .

[23]     *Javier Mota, 2015 Hyundai Genesis Smart Trunk system*, YouTube (Apr. 4, 2014), https://www.youtube.com/watch?v=jIchf9vLH-M .

57.     Similarly, in a graphic posted to Defendant's verified Twitter account on March 13, 2014, a man is standing next to a Genesis with a wide-open trunk. The accompanying text states, "Smart Trunk: No leg kicking required. **#NextGenesis #TBT #NAIAS**

http://www.hyundailikesunday.com/2014/03/12/2015-genesis-three-great-features …"

58.     The foregoing hyperlink goes to a corporate blog owned and operated by Defendant. The blog states, in part:

> Over the last few years, automakers have found new and creative ways to extend the use of this technology for situations for when both hands are occupied. For example, someone carrying a full load of groceries can leg-kick under the rear of the vehicle to activate a power tailgate or trunk. While this does come in handy, we wanted to take it a step further with the new Genesis (and avoid any awkward stares from people wondering if the leg-kick is a new dance move). With Smart Trunk, our engineers made it simple. It allows the driver to keep both feet comfortably on the ground, simply standing by the trunk for a few seconds, waiting for it to open automatically.[24]

59.     In addition to advertising on the Internet and social media, Defendant has promoted the Smart Trunk on television.

60.     In one commercial, an Elantra and Honda Civic are parked side by side. The voice-over announces, "All right, it's time for your Hyundai pop quiz." The voice-over then asks, "Which of these compact sedans do you think is equipped with optional automatic emergency braking . . . Oh, and a Smart Trunk that opens automatically when you approach it?"

61.     The trunk of the Elantra then automatically opens, as shown in *Figure 11*, and the voice-over concludes, "If you said the Hyundai Elantra, well, look who the smart one is now. Better is the reason to buy Hyundai."

---

[24]     Rob Lescaille, *2015 Genesis: Three Great Features*, Hyundai Like Sunday (March 12, 2014), http://www.hyundailikesunday.com/2014/03/12/2015-genesis-three-great-features/



The smart trunk will open when the smart key is within 40 inches of the detection area for at least 3 seconds. Radio transmitters and other vehicle smart keys may interfere in normal operation of the feature. Please consult Owner's Manual for further details. Make sure you close the trunk before driving.

*Figure 11: "Pop Quiz" Commercial.*

62.     Upon information and belief, this commercial was aired on television. It is also available on Defendant's verified YouTube channel.[25]

63.     Moreover, there is a description under the YouTube video which states, "Which of these two cars has . . . a hands-free smart trunk . . . Compare at: http://hyundai.us/neYYvr."

64.     The foregoing hyperlink goes to the page on Defendant's website that contains the advertisement referenced in Paragraph 31. To recap, this advertisement contends that loading a Civic is more difficult than an Elantra because the Civic does not have a Smart Trunk.

65.     In another commercial, dramatic instrumental music is playing, and the camera cuts to different features of the Elantra, including the front-end design, remote start, and the engine. Each time, the voice-over exclaims, "This!"

---

[25]     Hyundai USA, *Smarter Choice - Pop Quiz :30s | 2017 Hyundai Elantra*, YouTube (August 9, 2011), https://www.youtube.com/watch?v=DisO_fbeOsE .

66.     The camera then cuts to a man walking up to the rear of the Vehicle, and the voice-over proclaims, "And this!" The hazard lights then flash and the trunk opens approximately half-way.

67.     Near the end of the commercial, the voice-over opines, "Can a compact car have all of this and more? You have no idea."

68.     This commercial was, upon information and belief, aired on television. It was also published on Defendant's verified YouTube channel and was posted twice to Defendant's verified Facebook page in November 2015.  It has been viewed on Facebook over 189,000 times and on YouTube over 140,000 times.[26]

69.     A description under the YouTube video states, "It doesn't get better than THIS. Take a peek at the All-New Elantra and learn more about the features packed inside here: http://hyundai.us/rFV2TO."

70.     The foregoing hyperlink goes to a page on Defendant's website featuring the Elantra, and this page contains the advertisement referenced in paragraph 30, *supra.* To recap, this advertisement depicts a man with a basketball in one hand and a duffle bag in the other, standing next to an Elantra with the trunk approximately half-way open. The tagline declares, "Hands full? We'll get that." The advertisement further states, in part, "Everybody has stuff. Stuff that needs to be carried from here to there and back again. So loading becomes a problem. But for a moment you can transcend all of that with Elantra's hands-free smart trunk."[27]

71.     In addition to the Internet, social media, and television, Defendant has advertised the Smart Trunk in magazines, press releases, and other similar sources.

---

[26]     *See* Hyundai USA, *2017 Hyundai Elantra - "THIS"*, YouTube (Nov. 18, 2015) https://www.youtube.com/watch?v=W-4PG14XP0E; Hyundai, Facebook (Nov. 12, 2015), https://www.facebook.com/Hyundai/videos/10153266823963753; Hyundai, Facebook (Nov. 18, 2015), https://www.facebook.com/Hyundai/videos/10153275827118753/
[27]     *"We'll Get That" Ad*, *supra.*

72.     For instance, Defendant ran a two-page advertisement featuring the Smart Trunk in golf publications and PGA Tour booklets. *See Figure 12, infra.* The first page of the advertisement depicts a man carrying a bag of golf clubs and approaching a Hyundai Genesis with a closed trunk. The tagline states, "Remember when opening your trunk by hand was par for the course?" The second page depicts the same man approaching the same Vehicle, but the trunk is fully open. The tagline states, "That was then. This is Next." The accompanying text states:

> For those who love the perfect drive, we present the all-new Genesis. Featuring the hands-free smart trunk, which senses your key fob and automatically opens for you. Plus an intuitive suite of technology and safety features all available for the first time ever. Experience Next at HyundaiGenesis.com.



*Figure 12: Two-Page Print Advertisement.* [28]

---

[28]     *See Hyundai / All-New Genesis – Carissa Zaino / Copywriter*, http://carissazaino.com/Hyundai-All-New-Genesis (last accessed Aug. 10, 2016).

73.    Defendant also advertised, and continues to advertise, the Smart Trunk in brochures and pamphlets. For example, a brochure for the 2015 Sonata states, "It knows you're there . . . Sonata also features the first hands-free smart trunk in its class. Stand behind the trunk for three seconds with the key fob in your pocket or purse, and it opens automatically."  Accompanying this text is a picture of the back of a Sonata with superimposed images of the trunk lid, demonstrating that it opens at least half-way; wide enough to easily fit bulky items inside. *See Figure 13.*



*Figure 13: Smart Trunk Ad from 2015 Sonata Brochure.*[29]

---

[29]    *2015 Hyundai Sonata,* Hyundai, *available at* http://cdn.dealereprocess.com/cdn/brochures/hyundai/2015-sonata.pdf.

74.     A substantially similar advertisement appears in the brochure for the 2016 Sonata, and

Defendant also promoted the Smart Trunk in brochures for the 2015 and 2016 Azera, the 2015 and 2016

Genesis, and the 2017 Elantra.

**c**.     **The Smart Trunk is Defective and Does Not Open as Advertised.**

75.     Contrary to Defendants advertisements and representations, the Smart Trunk suffers from a

manufacturing defect which, in many cases, prevents the trunk from opening as advertised. Indeed, the

Smart Trunk only opens a few inches, or unlatches but does not open, in many Vehicles. Upon

information and belief, this is because the torsion bars and/or springs used in the Smart Trunk are

defective.

76.     As discussed in more detail *infra,* Plaintiff's Smart Trunk only opens a crack – barely wide

enough for Plaintiff to fit a finger under the trunk lid – as shown in *Figure 14.*



*Figure 14: The maximum amount Plaintiff's Smart Trunk can open.*

77.     This defect is widespread, as evidenced by the complaints and reviews discussed below. Indeed, the defect is so common that some of Defendant's authorized dealers mistakenly believe that the trunk is designed to only open a crack.

78.     The failure of the Smart Trunk to open more than a small amount makes "hands-free" loading impossible, as consumers must manually push open the trunk lid before anything can be placed inside. Consumers have therefore been deprived of the "hands-free" convenience which Defendant advertised and for which consumers paid.

79.     Moreover, contrary to the representations explicitly and impliedly made in Defendant's advertisements and promotional statements, the Smart Trunks for the Elantra, Sonata, and Azera are not capable of opening fully, nor were they even designed to do so. Rather, they were designed to, at most, open approximately half-way. Likewise, the Smart Trunk for the Genesis cannot automatically open fully without the optional Power Trunk Lid, which is part of a $3,500 upgrade package.  Indeed, the necessity of the Power Trunk Lid demonstrates that Hyundai's Smart Trunk was never designed to open fully.

80.     Similarly, Defendant failed to disclose to Plaintiff and Class members, through disclaimers or otherwise, that the Smart Trunk suffers from a defect that prevents the trunk lid from opening half-way, or at all, in many instances. Defendant also failed to disclose the fact that the Smart Trunk is not capable of opening fully, except for the Smart Trunk on a Genesis equipped with the Power Trunk Lid.

81.     Defendant, through its misrepresentations and omissions of material facts, has breached its warranty obligations, violated California consumer protection statutes and unjustly enriched itself, as alleged in detail *infra.*

**d.      Defendant Breached Its Warranty Obligations**

82.     In addition to misrepresenting the function and capabilities of the Smart Trunk and omitting critical facts about it, Defendant has failed to satisfy its warranty obligations.

24

83.     Defendant claims that its Vehicles carry "America's Best Warranty," which gives consumers "more than peace of mind, it's a commitment from Hyundai to maintain a high degree of quality, dependability, and reliability."[30]

84.     In addition to certain other warranties – such as a 10-year, 100,000 mile Powertrain Warranty – Defendant extends a 5-year, 60,000 mile New Vehicle Limited Warranty ("Warranty") on all of the Vehicles relevant to this litigation.

85.     The Warranty covers:

> [R]epair or replacement of any component originally manufactured or installed by Hyundai Motor Company, Hyundai Motor Group, Hyundai Motor Manufacturing Alabama (HMMA), Kia Motors Manufacturing Georgia (KMMG) or Hyundai Motor America (HMA) that is found to be defective in material or workmanship under normal use and maintenance, except any item specifically referred to in the section "What is Not Covered."

*See 2015 Owner's Handbook and Warranty Information*, at 18, attached hereto as Exhibit A.

86.     Moreover, the Warranty provides that "Parts replaced under the terms of the New Vehicle Limited Warranty . . . .are warranted for the remainder of the applicable warranty which the part was previously replaced under." *Id.* at 42.

87.     The Warranty is also "transferable to subsequent owners." *Id.* at 18.

88.     Upon information and belief, the Warranties for all Vehicles have been the same in all material respects since the 2015 model-year.

89.     The Smart Trunk is covered under the Warranty.

90.     Despite claiming to have "America's Best Warranty," Defendant has failed to provide Plaintiff and Class members with conforming, non-defective Smart Trunks, notwithstanding multiple attempts at repair in many cases. Indeed, as discussed *infra*, Defendant failed to provide Plaintiff with a conforming,

---

[30]     *America's Best Warranty*, Hyundai, https://www.hyundaiusa.com/assurance/america-best-warranty.aspx  (last accessed Aug. 9, 2016).

non-defective Smart Trunk despite at least eight repair opportunities, and Defendant subsequently refused to attempt further repairs even though Plaintiff's Warranty had not expired. Defendant is therefore liable for breach of express warranty.

91.     Defendant also breached the implied warranty of merchantability because the Smart Trunks sold and leased to Plaintiff and Class Members were defective at the time they left the possession of Defendant and were therefore not in merchantable quality and condition and were not fit for their ordinary intended purpose – namely, providing convenient, hands-free trunk access.

**e.     The Plaintiff's and Class Members' Experience with Defective Smart Trunks**

**i.   Plaintiff's Experience**

92.     Plaintiff purchased a model-year 2015 Hyundai Sonata Limited at Conicelli Hyundai in Conshohocken, Pennsylvania ("Conicelli") on or around August 8, 2014. Conicelli is an authorized Hyundai dealership and repair center.

93.     The Smart Trunk came standard with Plaintiff's Vehicle, and it was covered by a 5 year/60,000 mile New Vehicle Limited Warranty.

94.     Prior to purchasing his Vehicle in August of 2014, Plaintiff viewed the Smart Trunk advertisements on Hyundai's website, including but not limited to the same or a substantially similar advertisement to the one referenced in Paragraph 33, as well as advertisements for the Smart Trunk posted by Hyundai on social media, and Hyundai brochures containing the same, or substantially similar, images and statements as quoted in Paragraph 73. Plaintiff also viewed specification sheets on Defendant's website and the Conicelli website which stated that the 2015 Sonata Limited came with a "hands-free" Smart Trunk.

95.     Plaintiff considered the foregoing advertisements, video, brochures, specifications, and statements to be material because they pertained to the function, capabilities, and usefulness of the Smart Trunk. The ability of the trunk to automatically open wide enough to fit items inside "hands-free" was

important to Plaintiff as well as objectively important to a reasonable consumer. Specifically, Plaintiff and his wife had a baby on the way and Plaintiff's job requires him to frequently load boxes into his vehicle, and having a hands-free, automatic trunk was a material reason they purchased a Sonata Limited rather than a vehicle with a "dumb trunk" from one of Hyundai's competitors, such as a Toyota Camry.

96.     Plaintiff relied on the aforementioned advertisements and statements because they caused him to reasonably believe: 1) that the Smart Trunk in the 2015 Sonata would open at least half-way, or otherwise wide enough for him to fit bulky items inside the trunk without having to first manually push the trunk lid open; and 2) that the Smart Trunk did not suffer from a defect that would cause the trunk to fail to open as advertised.

97.     Prior to purchasing the Vehicle, Plaintiff also reviewed the Monroney Sticker on the window.

98.     A Monroney sticker is required to be affixed to the side window or windshield of every new car sold in the United States and can only be removed by the consumer. The sticker must include, *inter alia*, the vehicle's standard and added features.

99.     The Monroney Sticker for the 2015 Sonata Limited listed "hands-free Smart Trunk" as a standard feature.

100.    Defendant's advertisements and promotional statements were misrepresentations for the reasons set forth in this Complaint, and Plaintiff was deceived by them.

101.    Shortly after purchase, Plaintiff discovered that the Smart Trunk was defective and did not operate as advertised. Specifically, when he stood within three feet behind his Vehicle for at least three seconds, the hazard lights flashed and a chime sounded but the trunk merely unlatched and cracked open.

102.    The Smart Trunk failed to open more than a crack each time Plaintiff attempted to use the feature. Indeed, Plaintiff could barely fit a finger under the trunk lid after it unlatched, thus he could not possibly place anything in the trunk "hands-free."

103.    Plaintiff used his Smart Trunk in a manner consistent with its intended use; he did not misuse it, alter it, tamper with it, or subject it to excessive wear. Plaintiff took no action, and no conditions or events occurred, that would void the Warranty. *See* Exhibit A at 20.

104.    Plaintiff brought his Vehicle to Conicelli at least eight times for Smart Trunk repair but the defect was not fixed.

105.    On August 25, 2014, Plaintiff brought his Vehicle to Conicelli for Smart Trunk repair, but Conicelli did not perform any such repairs.

106.    On September 10, 2014, Plaintiff brought his Vehicle back to Conicelli and again requested repair of the Smart Trunk, but once again no such repairs were performed. According to the invoice given to Plaintiff by Conicelli, dated September 19, 2014, no repairs were performed because "the trunk opens as far as it is designed the deck lid compared to 2 other cars and no difference was found."

107.    Upon information and belief, the Smart Trunks on these two other Vehicles were also defective and opened only a crack.

108.    Plaintiff brought his Vehicle back to Conicelli for the third time on October 22, 2014, but no Smart Trunk repairs were performed because Conicelli was "waiting for answer back from FSE [field support engineer] for a resolution."

109.    On or around November 3, 2014, Conicelli "install[ed] SOP torsion bars" but this repair failed to fix the defect.

110.    On April 20, 2015, Plaintiff brought his Vehicle back to Conicelli for the fifth time for the Smart Trunk defect, but no repairs were performed. The April 22, 2015 invoice stated, "Call into [H]yundai tech assistance on trunk supports."

111.    Plaintiff brought his Vehicle back to Conicelli for the sixth time on May 4, 2015. According to the May 6, 2015 invoice, the Vehicle's torsion bars were replaced because they were "possibly weak" but this repair was unsuccessful because "no difference [was] seen in opening of [the] trunk."

28

112.    On September 1, 2015, Plaintiff brought his Vehicle to Conicelli for the seventh time.

Technicians "performed trunk lid adjustment at body shop" but this adjustment failed to fix the defect

because there was no change in the amount the Smart Trunk would open. Conicelli told Plaintiff that there

was nothing more Conicelli could do for him and that it would not perform any more warranty repairs on

his Smart Trunk. The Smart Trunk was still under warranty at this time.

113.    Conicelli advised Plaintiff to contact the Hyundai Motor America Eastern Regional Office to

request a buy-back or some other form of relief.

114.    Plaintiff followed Conicelli's instructions and filed a case with Defendant's Eastern Regional

Office on September 28, 2015. In an email dated November 13, 2015, Defendant stated:

> Good afternoon, Mr. Riaubia.  I have recently been informed by our
> engineer that the older parts were installed in your vehicle during the
> previous repair. I would strongly recommend you take your [S]onata back
> to the dealer to have the correct torsion bars installed in your trunk. The
> dealer has already been notified of the correct part to install. Please
> contact Conicelli and schedule an appointment to have the correct parts
> installed. The Service [M]anager there should already be aware of the
> [R]egion's involvement.  Thank you.

115.    On February 5, 2016, Plaintiff brought his Vehicle back to Conicelli for the eight time. The

torsion bars were replaced with the "correct" parts, but this did not fix the problem; the Smart Trunk still

failed to open more than a crack.

116.    Plaintiff emailed Defendant again on February 10, 2016, notifying Defendant that the repairs

were unsuccessful and seeking a resolution. Plaintiff sent Defendant at least six additional emails before

Defendant ultimately informed him on March 16, 2016 that there is "no further assistance I can offer you

at this time from the regional office." Plaintiff's Smart Trunk was still under warranty at this time.

117.    In sum, Defendant was unable to fix Plaintiff's Smart Trunk after being given numerous

opportunities to do so and refused to provide Plaintiff with any further assistance after multiple repair

attempts failed.

118.    Based on Plaintiff's experiences, there was no reasonable basis to believe that either Defendant or any of its affiliates could or would resolve, in any way, the defects with the Smart Trunk in his Vehicle.

119.    Accordingly, Defendant failed to deliver to Plaintiff a conforming, non-defective Smart Trunk and otherwise failed and refused to honor the terms of the warranty.

120.    Moreover, had Plaintiff known that the Vehicle had a Smart Trunk which suffered from a defect which could – and in fact did – prevent the trunk from opening more than a crack, he would not have purchased one or, at a minimum, would not have paid as much.

### ii.  Class Members' Experience with Defective Smart Trunks

121.    Members of the putative Class have had experiences similar to Plaintiff's.

122.    There are numerous consumer complaints about the Smart Trunk on automotive forums and other message boards on the Internet. A sample of these complaints is set forth below:

a.    "I personally think smart trunk is useless. It does not fully open up but unlocks and that's it. I have to put down my luggages and open it all the way up myself anyway."[31]

b.    "It seems there are a few LF Sonatas where the trunk actually opens half way or more but most people seem to say (and most reviews I've seen) that their trunk only opens a few inches. Hopefully this is something that Hyundai improves."[32]

c.    "Hey guys anyone else have the issue where the smart trunk only open up a little? I seen it open at least half way up before on another 2015 sonata."[33]

d.    "I've noticed [the Smart Trunk] issue on mine. Sometimes it just opens a little bit, frustrating when you have 500 bags on your hand."[34]

e.    "[The trunk] doesn't pop up as must [sic] as I thought it would. It just pops open, but doesn't pop up."[35]

---

[31]    Limdw90 (Feb. 5, 2015, 7:20 PM), http://www.hyundai-forums.com/lf-2015-sonata-i45/347521-useless-features.html.
[32]    Mogelijk (Feb. 6, 2015, 2:45 PM), http://www.hyundai-forums.com/lf-2015-sonata-i45/347521-useless-features.html.
[33]    Dinhtran (Oct. 31, 2014, 9:22 AM), http://www.hyundai-forums.com/lf-2015-sonata-i45/312417-info-spmart-trunk.html.
[34]    Indistinctly (Oct. 31, 2014, 3:35 PM), http://www.hyundai-forums.com/lf-2015-sonata-i45/312417-info-spmart-trunk-2.html.
[35]    FabrizioG (October, 4, 2014, 2:54 am), http://www.hyundai-forums.com/lf-2015-sonata-i45/312417-info-spmart-trunk.html.

    f.   "Mine doesn't open much either"[36]

    g.   "[G]uys the dealer mechanic said it's only unlock doesn't open half up, I saw from another youtube video where it just unlock in the video. This is disappointing because I still have to reach all the way down while my hands are holding on to stuff to pull the trunk up still."[37]

123.    In addition to consumer complaints, several automotive websites have published reviews criticizing the Smart Trunk.

124.    For example, a reviewer for Tech Radar wrote:

> Speaking of the backside, the Elantra Limited has a hands-free smart trunk, like the Kia Optima. The Elantra's implementation of the hands-free trunk is just as flawed, unfortunately. It can automatically release the trunk, but isn't powered or able to launch itself open automatically, so you still have to reach and lift the trunk open.[38]

125.    Likewise, a reviewer for Auto Focus stated that she wished the "trunk lid popped fully open, rather than just unlatching, since [she] still had to have a free hand while carrying [her] groceries to push the lid up."[39]

126.    A reviewer for Car Driven observed:

> If the Sonata's doors are locked and you have the key fob on your person, all you need to do is stand behind the trunk for about 3 seconds and the trunk will open itself. This seems like a brilliant idea on paper, but in practice there are a few issues. Firstly, about half the time the trunk will open and you are free to put all your [bags] inside. But the other half of the time, the system simply unlatches the trunk lid and it doesn't swing open. This causes you to put down all your bags . . . anyway.[40]

---

[36]    Denp3 (November 2, 2014, 7:18 PM), http://www.hyundai-forums.com/lf-2015-sonata-i45/312417-info-spmart-trunk-2.html.

[37]    Dinhtran (Nov. 22, 2014, 8:50 am), http://www.hyundai-forums.com/lf-2015-sonata-i45/312417-info-spmart-trunk-2.html.

[38]    Tuan Huynh, *Hyundai Elantra Review*, Tech Radar (Feb. 2, 2016), http://www.techradar.com/us/reviews/car-tech/hyundai-elantra-1314206/review.

[39]    Jil McIntosh, *2015 Hyundai Sonata 2.0T: Nice makeover, now about that noise...*, Auto Focus (Oct. 14, 2014), *http://www.autofocus.ca/cars/hyundai/2015-hyundai-sonata/2015-hyundai-sonata-4dr-sdn-20t-auto-ultimate/reviews*

[40]    Kevin Harrison, *Test Drive: 2015 Hyundai Sonata 2.0T Ultimate*, Car Driven (December 11, 2014), http://www.cardriven.ca/news-reviews/testdrives/test-drive-2015-hyundai-sonata-2-0t-ultimate .

127.    A reviewer for Edmunds wrote that a colleague reviewed a Sonata that had a Smart Trunk that opened properly (on the second attempt), but the Smart Trunk on the reviewer's Sonata did not. He stated, "As you can see from the video, the trunk merely unlatches. It doesn't fully open to receive an armload of groceries."[41]

128.    Indeed, the Smart Trunk fails to open as advertised so frequently that many authorized Hyundai dealers erroneously believe that it is only supposed to crack open. For instance, in one YouTube video posted by Green Family Hyundai, an employee is demonstrating how the Smart Trunk works. He states, "This is a 2016 Sonata. And this is a Smart Trunk. What's a Smart Trunk?" He then walks up to the trunk, and after the three-second countdown the trunk unlatches and pops open a crack, as shown in *Figure 15.*



*Figure 15: Green Family Hyundai Smart Trunk Demo Video.*[42]

[41]       Carlos Lago, *2015 Hyundai Sonata: Smart Trunk Surprise — Here's How It Works (with Video), Edmunds (*Nov. 3, 2015), http://www.edmunds.com/hyundai/sonata/2015/long-term-road-test/2015-hyundai-sonata-smart-trunk-surprise-heres-how-it-works-with-video.html
[42]       Green Family Hyundai, *Smart Trunk in the 2016 Hyundai Sonata*, YouTube (July 6, 2016), https://www.youtube.com/watch?v=oybrvbOmlro.

129.    The employee continues:

> It's a trunk that pops up and unlocks without touching any buttons. Now, it's not quite as awesome as some of our SUVs that have the automatic lift gate that goes all the way up, but it's the only car in its class that does this.

130.    Upon information and belief, Green Family Hyundai is an authorized Hyundai dealership located in Moline, Illinois.

131.    Similarly, in a video posted on YouTube by Massey Hyundai, an employee is demonstrating the Smart Trunk feature on a 2015 Sonata. He describes the Smart Trunk as his "favorite feature" on the Sonata and verbally explains how it works. He then walks to the rear of the Vehicle, and after the three-second countdown the trunk unlatches and cracks open, as shown in *Figure 16*. He then manually pushes the trunk lid up and concludes by saying, "There you have it."



*Figure 16: Massey Hyundai Smart Trunk Demo Video.*[43]

---

132.     Upon information and belief, Massey Hyundai is an authorized Hyundai dealership in Hagerstown, Maryland.

## CLASS ACTION ALLEGATIONS

133.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a Class defined as:

> All individuals or entities in the United States who leased or purchased, not for resale, a Hyundai vehicle equipped with a Smart Trunk.

134.     Additionally, Plaintiff brings this action as a class action on behalf of the following Subclass for the purposes of Plaintiff's express warranty, implied warranty, and unjust enrichment claims under Pennsylvania law (the "Pennsylvania Subclass"):

> All individuals or entities in Pennsylvania who leased or purchased, not for resale, a Hyundai vehicle equipped with a Smart Trunk.

135.     Excluded from the Class and Subclass are: (a) Defendant, including any entity in which Defendant has a controlling interest, and its representatives, officers, directors, employees, assigns and successors; (b) any person or entity who has settled or released these same claims against Defendant as evidenced by a written release; (c) any person asserting a claim for personal injury; and (d) the Judge to whom this case is assigned.

136.     Plaintiff is a member of the Class and Subclass that he seeks to represent. Members of the proposed Class and Subclass are fully ascertainable and can be identified using Defendant's sales records (including sales records from its authorized dealers), other information kept by Defendant in the usual course of business, and/or other documents that are obtained through reasonable means. Class Members can be notified of the class action through publication on Internet forums and websites as well as direct mailings or e-mailings to address lists maintained by Defendant or otherwise obtained through reasonable means.

137.   <u>Numerosity/Impracticability of Joinder</u>:  The members of the Class and Subclass are so numerous that joinder of all members would be impracticable.  The proposed Class and Subclass include, at a minimum, thousands of members.  The precise number of Class and Subclass Members can be ascertained by reviewing documents and records in Defendant's possession, custody, and control, or otherwise obtained through reasonable means.

138.   <u>Commonality and Predominance</u>:  There are common questions of law or fact which predominate over any questions affecting only individual members of the Class and Subclass.  These common legal or factual questions, include, but are not limited to the following:

    a.    Whether Defendant engaged in a pattern of fraudulent, deceptive and misleading conduct;

    b.    Whether Defendant made material misrepresentations of fact or omitted stating material facts to Plaintiff and the Class regarding the characteristics or operation of the Smart Trunk or the defective nature of the Smart Trunk;

    c.    Whether Defendant's acts and omissions violated California consumer protection, unfair competition, and/or false advertising statutes;

    d.    Whether Defendant breached its express and implied warranties;

    e.    Whether Defendant represented that the Smart Trunk is of a particular standard, quality, or grade when it is of another;

    f.    Whether Defendant represented that the Smart Trunk has characteristics, uses, or benefits that it does not;

    g.    Whether, as a result of Defendant's misconduct, Plaintiff and the Class are entitled to relief, and, if so, the nature of such relief;

    h.    Whether, by the misconduct set forth herein, Defendant violated the common law of unjust enrichment; whether Plaintiff and members of the Class have sustained ascertainable loss and damages as a result of Defendant's acts and omissions, and the proper measure thereof.

139.   <u>Typicality</u>:  The representative Plaintiff's claims are typical of the claims of the members of the Class and Subclass he seeks to represent.  Plaintiff and members of the Class and Subclass have been injured by the same wrongful practices in which Defendant has engaged. Plaintiff's claims arise from the

same practices and course of conduct that give rise to the claims of the members of the Class and Subclass and are based on the same legal theories.

140.    <u>Adequacy</u>:  Plaintiff is a representative that will fully and adequately assert and protect the interests of the Class and Subclass, and has retained class counsel who are experienced and qualified in prosecuting class actions.  Neither Plaintiff nor his attorneys have any interests which are contrary to or conflicting with the Class and Subclass.

141.    <u>Superiority</u>:  A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all Class Members is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class and Subclass are likely in the millions of dollars, the individual damages incurred by each Class member resulting from Defendant's wrongful conduct are too small to warrant the expense of individual suits.  The likelihood of individual Class Members prosecuting their own separate claims is remote, and, even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Individual members of the Class and Subclass do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and to the court system because of multiple trials of the same factual and legal issues. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. In addition, Defendant has acted or refused to act on grounds generally applicable to the Class and Subclass and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

142.    In the alternative, Plaintiff seeks certification pursuant to Rule 23(c)(4) on the issues of: (a) whether Defendant breached the warranties it made to Plaintiff and the Class; and (b) whether Defendant

engaged in deceptive, confusing or misleading practices in connection with the sale and warranting of vehicles equipped with Smart Trunks.

### COUNT I
### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
#### (On Behalf of Plaintiff and the Class)

143.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

144.    California Business and Professions Code § 17200, *et seq*., the Unfair Competition Law ("UCL"), prohibits any "unlawful, unfair, or fraudulent business act or practices."

145.    Plaintiff, members of the Class, and Defendant are "persons" within the meaning of the UCL.

146.    The UCL can be constitutionally applied to the claims of the Plaintiff and Class Members, regardless of the state in which they reside or purchased their Vehicles, for the reasons in the following paragraphs.

147.    Defendant has a substantial presence in, and contact with, California. Upon information, belief, and investigation of counsel, Defendant is headquartered in Fountain Valley, California and directs its operations from there. Defendant also designs, researches, and tests Vehicles in California.[44] Indeed, at Defendant's California "Proving Grounds," Defendant "leave[s] parts out in the sun for years on end to make sure they'll stand up to even the most extreme heat," "punish[es] vehicles over rough terrain, hairpin turns and pothole-riddled highways," and "simulate[s] America's most demanding driving conditions, over and over and over again."[45]   Defendant does this until it is "completely satisfied that every Hyundai is durable, reliable, and battle-tested."[46]

---

[44]      *Built in America | Vehicles Creating Jobs*, Hyundai USA, https://www.hyundaiusa.com/new-thinking/built-in-usa.aspx (last accessed August 11, 2016).
[45]      *Quality & Testing | Vehicle Assurance | Hyundai*, Hyundai USA, https://web.archive.org/web/20141210114452/https://www.hyundaiusa.com/new-thinking/quality.aspx  (last accessed Aug. 11, 2016).
[46]      *Id.*

148.    Upon information and belief, there are approximately 80 authorized Hyundai dealers in California, which demonstrates that Defendant does substantial business in California and that a large percentage of the Class is likely to reside there.

149.    Moreover, the unlawful conduct giving rise to this claim occurred in and emanated from California. Specifically, the advertisements, materials, and statements at issue in this litigation were conceived, created, orchestrated, and published by Defendant in California and were distributed, electronically and otherwise, from California to Plaintiff and Class Members. This is evidenced by the following:

    a.  Defendant employs Public Relations employees and managers in California who, *inter alia*, manage Defendant's social media channels, oversee Defendant's corporate, product, and media relations, and support Defendant's corporate communications, marketing, and advertising programs.[47]

    b.  Defendant's Twitter page lists Fountain Valley, California as its address.[48]

    c.  Defendant issues press releases from its headquarters in California, including press releases containing promotional statements pertaining to the Smart Trunk.[49]

    d.  Defendant's website, hyundaiusa.com, is registered to, and administered by, Defendant at its headquarters in Fountain Valley, California.[50]

150.    Defendant violated the UCL for the following reasons:

    a.  It engaged in unlawful conduct.

    b.  It made material misrepresentations and omissions.

---

[47]    *See PR Contacts,* Hyundai Motor America Newsroom, http://www.hyundainews.com/us/en/contacts  (last accessed Aug. 11, 2016).

[48]    Hyundai USA, https://twitter.com/hyundai  (last accessed Aug. 11, 2016).

[49]    *See, e.g.* Press Release, Hyundai Motor America, *Fresh Exterior and Interior Design Cues Coupled with Cutting-edge Safety Technologies Increase Premium Sedan's Appeal* (Dec. 11, 2014), http://www.hyundainews.com/us/en/media/pressreleases/42292/2015-azera-receives-compelling-design-and-safety-enhancements.

[50]    *See ICANN Whois*, Internet Corporation for Assigned Names and Numbers, https://whois.icann.org/en/lookup?name=hyundaiusa.com  (last accessed Aug. 11, 2016).

      c.  It engaged in immoral, unethical, unscrupulous, and oppressive conduct, or conduct that is otherwise against established public policy.

151.    More specifically, Defendant violated the UCL's "unlawful" prong by violating California's Consumer Legal Remedies Act and False Advertising Law, as set forth *infra.*

152.    Defendant violated the UCL's "fraudulent" prong because it made material misrepresentations and omissions regarding the Smart Trunk, as set forth in this Complaint.

153.    Upon viewing the advertisements, statements, and representations discussed *supra* – such as pictures and videos of the Smart Trunk automatically opening fully or half-way and statements that the Smart Trunk is "hands-free," "opens automatically," and is helpful when "you're loaded down with boxes and bags" – a reasonable consumer would conclude that the Smart Trunk on the Elantra, Sonata, and Azera automatically opens at least half-way, if not fully, and that it does not suffer from a defect that causes it to fail to open as advertised.

154.    Upon viewing the advertisements, statements, and representations regarding the Genesis discussed *supra* – such as pictures and videos of the trunk automatically opening fully and statements that the Smart Trunk is "hands-free" and "opens automatically" – a reasonable consumer would conclude that the Smart Trunk on the Genesis automatically opens fully and that it does not suffer from a defect that causes it to fail to open as advertised.

155.    Defendant's advertisements, statements, and representations regarding the Smart Trunk are not mere puffery or hyperbole. They are specific representations and affirmations of the function, capabilities, and usefulness of the Smart Trunk, and a reasonable consumer would therefore consider them to be material.

156.    Defendant's advertisements, statements, and representations are false, misleading, and deceptive for the following reasons: 1) the Smart Trunk suffers from a serious defect which prevents it from opening the trunk lid as advertised; 2) the Smart Trunks for the Elantra, Sonata, and Azera are not

capable of opening fully; and 3) the Smart Trunk for the Genesis cannot open fully without the optional Power Trunk Lid, which is part of a $3,500 upgrade package.

157.    Indeed, many Vehicles are equipped with defective Smart Trunks that merely unlatch and open a few inches or a crack. This requires consumers to manually push the trunk lid open, thereby eliminating the "hands-free" convenience the Smart Truck is advertised as providing.

158.    Members of the public would likely be deceived by the advertisements and statements referenced in this Complaint because they are specific representations and affirmations of the function, capabilities, and usefulness of the smart trunk and are not mere "puffery" or hyperbole.

159.    Indeed, Plaintiff was deceived by Defendant's misrepresentations. Prior to purchase, Plaintiff was exposed to and viewed Defendant's advertisements, brochures, specifications, videos, and other statements as set forth above.

160.    Upon viewing these advertisements and things, Plaintiff concluded that: (1) the Smart Trunk on the 2015 Sonata opened at least half-way – wide enough for him to fit bulky items inside the trunk without having to first manually push the trunk lid open; and (2) the Smart Trunk did not suffer from a defect that would cause it to fail to open as advertised.

161.    Plaintiff considered these advertisements and things to be material and he was deceived by them, acted in reliance on them, and suffered harm as a result.

162.    In addition, under California law, a duty to disclose arises when the undisclosed facts are material and contrary to an affirmative representation made by the defendant. There is also a duty to disclose when: 1) the defendant is in a fiduciary relationship with the plaintiff; 2) the defendant had exclusive knowledge of material facts not known to the plaintiff; 3) the defendant actively conceals a material fact from the plaintiff; or 4) when the defendant makes partial representations but also suppresses some material facts.

163.    Defendant had a duty to disclose the following facts, without limitation: 1) the Smart Trunk contains a defect that, in many cases, prevents the trunk from opening more than a crack or a couple inches or otherwise prevents it from opening as far as advertised; and 2) the Smart Trunk is not capable of opening fully except on a Genesis equipped with a Power Trunk Lid.

164.    Defendant had a duty to disclose the foregoing facts for the following four independent reasons: 1) these facts were directly contrary to affirmative representations made by Defendant; 2) Defendant had exclusive knowledge of these facts at the time of sale; 3) Defendant actively concealed these facts from Plaintiff and Class Members; and 4) Defendant made partial representations to Plaintiff and Class Members regarding how far the Smart Trunk opens.

165.    Defendant utterly failed to disclose these facts to Plaintiff and members of the Class despite knowing about the true performance and capabilities of the Smart Trunk and the defect inherent therein. Upon information and belief, Defendant had such knowledge prior to introducing the Smart Trunk as an available feature because it designed, researched, and/or tested it, and the defect is relatively simple and easily discoverable. Moreover, upon information and belief, Defendant obtained the aforesaid knowledge from, without limitation, the following sources: 1) consumer complaints about the Smart Trunk and negative reviews by automotive critics; 2) Smart Trunk repairs performed under warranty by authorized dealerships; and 3) the fact that the defect is so widespread that many authorized dealers mistakenly believe that the Smart Trunk is designed to only unlatch and crack open.

166.    Defendant's omissions and misrepresentations are material because they pertain to the Smart Trunk's function, capabilities, and usefulness, and a reasonable consumer would attach importance to the existence or non-existence of a defect that strongly and adversely affects these qualities. Simply put, in deciding whether to purchase a Vehicle with a Smart Trunk, a reasonable consumer would want to know whether the Smart Trunk does, in fact, open wide enough to make it a convenient, hands-free feature.

167.    If Defendant had disclosed the foregoing facts, the facts would have become known to Plaintiff and Class members because they would have, upon information and belief, been included in disclaimers in Defendant's advertisements and promotional materials, included in Vehicle manuals, verbally disseminated by authorized dealers, and published in other print, electronic, and Internet sources.

168.    Plaintiff would not have purchased a 2015 Hyundai Sonata Limited, or at a minimum would have paid less, if he had known that the Smart Trunk is defective. Since Defendant's misrepresentations and omissions were material, it may be presumed that members of the Class would not have purchased or leased a Vehicle with a Smart Trunk – or at a minimum would have paid less for the Vehicle or the upgrade package – if they had known about the Smart Trunk's defect and limitations.

169.    Defendant violated the UCL's "unfair" prong because Defendant's acts and practices set forth in this Complaint offend established public policy or are otherwise immoral, unethical, unscrupulous, and oppressive.

170.    These acts and practices include, without limitation, Defendant marketing and selling Vehicles and upgrade packages knowing the Smart Trunk is defective; failing to adequately disclose and remedy the defect; failing to disclose the Smart Trunk's limitations; misrepresenting the function and capabilities of the Smart Trunk; and refusing to provide assistance to consumers after initial attempts at repair have failed.

171.    The harm these acts and practices cause to consumers greatly outweighs any benefits associated with those acts and practices.

172.    Defendant's conduct has also impaired competition within the consumer vehicle market and has prevented Plaintiff and Class Members from making fully informed decisions about whether to purchase or lease Vehicles or upgrade packages and/or the price to be paid for them.

173.    Plaintiff has standing to pursue all of the foregoing Unfair Competition Law claims on behalf of the Class because he has suffered an injury in fact, including the loss of money or property, as a result of and in reliance on Defendant's unfair, unlawful, and deceptive practices, as set forth in this Complaint.

174.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated throughout the country.

175.    Accordingly, Plaintiff and the Class request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and the Class any money Defendant acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for attorney's fees and costs.

## COUNT II
### VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW
#### (On behalf of Plaintiff and the Class)

176.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

177.    California Business and Professions Code § 17500, *et seq.*, the False Advertising Law ("FAL"), proscribes the dissemination of a statement which is "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

178.    The FAL prohibits statements that are "disseminated before the public in [California]" as well as those that are "disseminated from [California] before the public in any state."

179.    As alleged *supra*, the misrepresentations at issue in this litigation were disseminated from California to the Plaintiff in Pennsylvania and to Class members across the country.

180.    Moreover, the FAL can be constitutionally applied to the claims of Plaintiff and Class Members, regardless of the state in which they reside or purchased their Vehicles, for the reasons set forth *supra.*

181.    Plaintiff and the members of the Class are "persons" within the meaning of the FAL.

43

182.   Defendant is a "corporation" within the meaning of the FAL.

183.   Defendant engaged in advertising and marketing to the public and offered Vehicles and upgrade packages for sale.

184.   Defendant engaged in the advertising and marketing alleged herein with the intent to induce the sale of its Vehicles and upgrade packages to consumers.

185.   Defendant's advertising and marketing representations regarding the Smart Trunk were untrue, misleading, and material as set forth in detail *supra*. Defendant also concealed material information from consumers regarding the Smart Trunk's defect and limitations.

186.   Defendant's misrepresentations and omissions deceive or have the tendency to deceive the general public for the reasons described in detail *supra*.

187.   Since Defendant's misrepresentations and omissions are objectively material to a reasonable consumer, reliance on them by Class Members may be presumed as a matter of law.

188.   At the time the misrepresentations were made, Defendant knew, or should have known, that they were untrue or misleading. Defendant's knowledge stemmed from, without limitation, the following: 1) Defendant designed, researched, and/or tested the Smart Trunk, and the defect is relatively simple and easily ascertainable; 2) consumers complained about the Smart Trunk and automotive critics wrote negative reviews; 3) Smart Trunk repairs were performed under warranty by authorized dealerships, and dealerships share warranty repair information with the manufacturer; and 4) the defect was so widespread that many authorized dealers mistakenly believed that the Smart Trunk was designed to only unlatch and crack open.

189.   Plaintiff has standing to pursue a FAL claim on behalf of the Class because he has suffered an injury in fact, including the loss of money or property, as a result of and in reliance on Defendant's false advertising. As set forth *supra*, Plaintiff was exposed to and read Defendant's misrepresentations prior to purchase, considered them material, relied on them, and was deceived and injured by them.

190.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated throughout the country.

191.    Accordingly, Plaintiff and the Class request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its false advertising practices and to restore to Plaintiff and the Class any money Defendant acquired by false advertising, including restitution and/or restitutionary disgorgement, and for attorney's fees and costs.

## COUNT III
## VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT
### (On behalf of Plaintiff and the Class)

192.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

193.    California Civil Code § 1750, *et seq.*, the Consumer Legal Remedies Act ("CLRA"), prohibits several enumerated unfair methods of competition and unfair or deceptive acts or practices including, without limitation:

    a.  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have.  Cal. Civ. Code § 1770(a)(5).

    b.  Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another. Cal. Civ. Code § 1770(a)(7).

    c.  Advertising goods or services with intent not to sell them as advertised. Cal. Civ. Code § 1770(a)(9).

    d.  Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not. Cal. Civ. Code § 1770(a)(16).

194.    The CLRA can be constitutionally applied to the claims of Plaintiff and Class Members, regardless of the state in which they reside or purchased their Vehicles, for the reasons set forth *supra*.

195.    Defendant is a "person" as defined in the CLRA.

196.    Plaintiff and Class Members acquired and purchased Vehicles equipped with Smart Trunks for personal, family, or household purposes and are therefore "consumers" as defined in the CLRA.

197.    The Vehicles and Smart Trunks are "goods" as defined by the CLRA.

198.    The purchases by Plaintiff and Class Members of the goods sold by Defendant constitute "transactions" as defined by the CLRA.

199.    In connection with its sale of goods to Plaintiff and the Class, Defendant violated the CLRA, including without limitation §§ 1770(a)(5), (7), (9), and (16), by:

> e.   Knowingly misrepresenting that the Smart Trunk will always open the trunk lid half-way – or at least wide enough to load bulky items such as shopping bags and sports equipment into the trunk "hands-free" – when, in fact, the Smart Trunk suffers from a defect which, in many cases, prevents the trunk from opening more than a crack or a couple inches or otherwise prevents it from opening as far as advertised, thereby making "hands-free" loading difficult or impossible.

> f.   Knowingly misrepresenting that the Smart Trunk is capable of opening the trunk lid fully when, in fact, the Smart Trunk on the Elantra, Sonata, and Azera is only capable of opening half-way and Smart Trunk on the Genesis can only open half-way unless the consumer pays extra for the Power Trunk Lid.

200.    In addition, under California law, a duty to disclose arises when the undisclosed facts are material and contrary to an affirmative representation made by the defendant. There is also a duty to disclose when: 1) the defendant is in a fiduciary relationship with the plaintiff; 2) the defendant had exclusive knowledge of material facts not known to the plaintiff; 3) the defendant actively conceals a material fact from the plaintiff; or 4) when the defendant makes partial representations but also suppresses some material facts.

201.    Defendant had a duty to disclose the Smart Trunk's defect and limitations for the following four independent reasons: 1) these facts were directly contrary to affirmative representations made by Defendant; 2) Defendant had exclusive knowledge of these facts at the time of sale; 3) Defendant actively

concealed these facts from Plaintiff and Class Members; and 4) Defendant made partial representations to Plaintiff and Class Members regarding how far the Smart Trunk opens.

202.    Defendant had a duty to disclose, and failed to disclose, *inter alia*, 1) that the Smart Trunk contains a defect that, in many cases, prevents the trunk from opening more than a crack or a couple inches or otherwise prevents it from opening as far as advertised or providing "hands free" functionality; and 2) that the Smart Trunk is not capable of opening fully except on a Genesis equipped with a Power Trunk Lid.

203.    Defendant utterly failed to disclose the foregoing despite knowing about the true performance and capabilities of the Smart Trunk and the defect inherent therein. Defendant's knowledge stemmed from, without limitation, the following: 1) Defendant designed, researched, and/or tested the Smart Trunk, and the defect is relatively simple and easily ascertainable; 2) consumers complained about the Smart Trunk and automotive critics wrote negative reviews; 3) Smart Trunk repairs were performed under warranty by authorized dealerships, and dealerships share warranty repair information with the manufacturer; and 4) the defect was so widespread that many authorized dealers mistakenly believed that the Smart Trunk was designed to only unlatch and crack open.

204.    If Defendant had disclosed the foregoing facts, the facts would have become known to Plaintiff and Class members because they would have, upon information and belief, been included in disclaimers in Defendant's advertisements and promotional materials, included in Vehicle manuals, verbally disseminated by authorized dealers, and published in other print, electronic, and Internet sources.

205.    In sum, Defendant violated the CLRA by supplying defective Smart Trunks and knowingly misrepresenting their qualities, characteristics, and capabilities and by knowingly concealing material facts regarding the same.

206.    Defendant's misrepresentations and omissions were likely to mislead an ordinary consumer for the reasons discussed in detail in this Complaint, and they did in fact mislead Plaintiff.

207.    Defendant's omissions and misrepresentations were material for the reasons discussed *supra*.

208.    Plaintiff and the Class relied to their detriment on Defendant's misrepresentations and omissions in purchasing and leasing Vehicles and upgrade packages, and were injured.

209.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated throughout the country.

210.    Accordingly, Plaintiff and the Class request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its acts and practices that are in violation of the CLRA and to award Plaintiff and the Class actual damages, punitive damages, attorney's fees, and any other relief this Court deems just and appropriate.

211.    Pursuant to Cal. Civ. Code § 1782(a), on June 7, 2016 counsel for Plaintiff and the Class served Defendant by United States Certified Mail, Return Receipt Requested with notice of its violations of the CLRA ("Notice"), attached hereto as Exhibit B.

212.    Defendant failed to remedy the wrongs complained of in the Notice within 30 days. Accordingly, Plaintiff and the Class are now entitled to the above-requested relief.

**COUNT IV**
**BREACH OF EXPRESS WARRANTY**
**(Pa.C.S. § 2313)**
**(On Behalf of Plaintiff and the Pennsylvania Subclass)**

213.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

214.    As an express warrantor and manufacturer and merchant, Defendant has certain obligations under 13 Pa.C.S. § 2313 to ensure the Smart Trunks conform to their Warranty.

215.    When Plaintiff and Subclass members purchased or leased Vehicles with Smart Trunks, Defendant warranted that it would repair or replace their Smart Trunks free of charge if they were defective in material or workmanship. *See* Exhibit A.

216.    Plaintiff and Subclass members were aware of the Warranty at the time of sale or lease, because, *inter alia*: 1) Hyundai heavily promotes its warranty program, which it touts as "America's Best Warranty"; 2) the terms of the Warranty are available on Defendant's website and in the *Owner's Handbook & Warranty Information*; 3) upon information and belief, salesmen at authorized dealerships routinely inform consumers of the existence and coverage of the Warranty; and 4) the Warranty is listed on the Monroney sticker for each Vehicle.

217.    Indeed, the Warranty formed a basis of the bargain that was reached when Plaintiff and Subclass Members purchased or leased their Vehicles.

218.    Defendant breached the Warranty – and continues to breach it – because it has failed to deliver non-defective Smart Trunks to Plaintiff and Subclass Members despite, in many cases, multiple attempts at repair.

219.    Specifically, the Smart Trunks sold or leased to Plaintiff and Subclass Members are defective, as alleged in detail in this Complaint, and the defect was present at the time of each transaction. Moreover, Defendant and its authorized dealers have failed to correct, repair, or eliminate the defect.

220.    Indeed, Defendant failed to provide Plaintiff with a conforming, non-defective Smart Trunk despite numerous repair attempts, and Defendant subsequently refused to cover further repairs under the Warranty even though the Plaintiff's Warranty had not expired.

221.    Plaintiff used his Smart Trunk in a manner consistent with its intended use; he did not misuse it, alter it, tamper with it, or subject it to excessive or unnecessary wear. Plaintiff took no action, and no conditions or events occurred, that would void the warranty. Moreover, Plaintiff has performed each and every duty required under the terms of the warranty, except as may have been excused or prevented by the conduct of Defendant or by operation of law.

222.    Defendant has received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.  Affording Defendant further opportunity to cure its breach of warranty would be unnecessary and futile.

223.    Additionally, upon information and belief, Defendant otherwise has knowledge of the defect at issue in this litigation, as explained *supra*.

224.    In its capacity as a supplier and/or warrantor, and by the deceptive, unfair, and unconscionable conduct described herein, any attempt by Defendant to limit the Warranty in a manner that would exclude or limit coverage for the defects present in the Smart Trunks as of the time of sale, which Defendant knew about prior to offering the Smart Trunks for sale, which Defendant concealed and did not disclose, and did not remedy prior to sale or afterward, is unconscionable, and any such effort to disclaim or otherwise limit liability for the defects at issue is null and void.

225.    Any attempt by Defendant to limit or exclude any form of damages or other remedies, including without limitation consequential and incidental damages, is unconscionable and therefore null and void due to Defendant's deceptive, unfair, and unconscionable conduct.

226.    Plaintiff and the Subclass Members have been injured by Defendant's breach of warranty and seek to recover damages including, without limitation, restitution; consequential and incidental damages; attorney's fees and costs; and any other relief this Court deems just and appropriate.

### COUNT V
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Pa.C.S. § 2314)
### (On Behalf of Plaintiff and the Pennsylvania Subclass)

227.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

228.    A warranty that the Smart Trunks are in merchantable quality and condition is implied under 13 Pa.C.S. § 2314.

229.    Defendant is, and was at all relevant times, a merchant with respect to the Smart Trunks.

230.    Defendant did not disclaim the implied warranty of merchantability.

231.    Defendant impliedly warranted that the Smart Trunks were of good and merchantable condition and quality – fit for their ordinary intended use, namely allowing consumers to place items into their trunks "hands-free."

232.    The Smart Trunks were defective at the time they left the possession of Defendant in the ways described in detail *supra*. Defendant knew of the defects at the time these transactions occurred, as set forth in this Complaint. Thus, the Smart Trunks, when sold and at all times thereafter, were not in merchantable condition or quality and were not fit for their ordinary intended purposes.

233.    Plaintiff used his Smart Trunk in a manner consistent with its intended use; he did not misuse it, alter it, tamper with it, or subject it to excessive or unnecessary wear. Plaintiff took no action, and no conditions or events occurred, that would void the warranty. Moreover, Plaintiff has performed each and every duty required under the terms of the warranty, except as may have been excused or prevented by the conduct of Defendant or by operation of law.

234.    Defendant has received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy. Additionally, upon information and belief, Defendant otherwise has knowledge of the defect at issue in this litigation, as alleged in this Complaint.

235.    By virtue of the conduct described herein and throughout this Complaint – namely, its failure to deliver merchantable Smart Trunks to Plaintiff and Subclass members, Defendant breached the implied warranty of merchantability.

236.    Any attempt by Defendant to limit or exclude any form of damages or other remedies, including without limitation consequential and incidental damages, is unconscionable and therefore null and void due to Defendant's deceptive, unfair, and unconscionable conduct.

237.    As a direct and proximate cause of Defendant's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged by receiving an inferior product from that which they were impliedly promised. Plaintiff and the Subclass, therefore, seek to recover damages including, without limitation, restitution, consequential and incidental damages, attorney's fees and costs, and any other relief the Court deems just and appropriate.

## COUNT VI
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (On Behalf of Plaintiff and the Class)

238.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

239.    The Vehicles are "consumer products" as that term is defined by 15 U.S.C. § 2301(1).

240.    Plaintiff and the Class members are "consumers" as that term is defined by 15 U.S.C. § 2301(3).

241.    Defendant is a "supplier" as that term is defined by 15 U.S.C. § 2301(4).

242.    Defendant is a "warrantor" as that term is defined by 15 U.S.C. § 2301(5).

243.    Defendant provided Plaintiff and Class members with "written warranties" as that term is defined by 15 U.S.C. § 2301(6).

244.    Section 15 U.S.C. § 2310(d)(1) provides that a consumer who is damaged by the failure of the supplier, warrantor, or service contractor to comply with any obligation under this title, or a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief in any court of competent jurisdiction in any state.

245.    When Plaintiff and the members of the Class purchased their Vehicles (either as new Vehicles or used Vehicles with remaining Warranty coverage), Defendant expressly warranted that it would properly repair/replace factory-installed parts at no charge to the consumer if they fail to function properly under normal use for 60 months or 60,000 miles.

246.     Defendant breached the express Warranty because the defect in the Smart Trunk at issue was present in the Vehicles at the time of sale, Defendant knew that the Smart Trunk was defective, and Defendant did not disclose or repair the defect with the Smart Trunk prior to each sale or lease.

247.     Defendant also breached the Warranty (and continues to breach the Warranty) because it wrongfully, uniformly, and repeatedly refuses to cover the defective Smart Trunk under the Warranty, forcing Plaintiff and the members of the Class to cover the costly installation of additional or replacement parts themselves.

248.     Even if Defendant covered these repairs under the Warranty, the Warranty would fail of its essential purpose because Defendant merely replaces defective parts with equally defective parts that make up the Smart Trunk.

249.     Plaintiff used his Vehicle in a manner consistent with its intended use and performed each and every duty required under the terms of the Warranty including presentment, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's unconscionable conduct described throughout this Complaint.

250.     In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Defendant to limit its express warranties in a manner that would exclude or limit coverage for the defective Smart Trunk that was present as of the time of sale is unconscionable and any such effort to disclaim or otherwise limit liability or Warranty coverage for the defects at issue is null and void.

251.     All jurisdictional prerequisites have been satisfied.

252.     Accordingly, Plaintiff and the Class members suffered damages caused by Defendant's breach of the express warranties and are entitled to recover damages, including, but not limited to, diminution of value, equitable relief, and attorneys' fees and costs pursuant to 15 U.S.C. § 2310.

## COUNT VII
## UNJUST ENRICHMENT
### (On behalf of Plaintiff and the Pennsylvania Subclass)

253.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

254.    In the alternative to Counts IV, V, and VI, Plaintiff, on behalf of himself and the Subclass, makes the allegations set forth in following paragraphs of this Count VII.

255.    Through the deceptive, unfair, and unconscionable conduct and statements described in this Complaint, Defendant sold Vehicles with defective Smart Trunks to Plaintiff and Subclass Members and thereafter failed and refused to provide them with non-defective Smart Trunks that operate as advertised.

256.    Such conduct includes, without limitation, marketing and selling Vehicles knowing that they contain defective Smart Trunks; marketing and selling Vehicles knowing the Smart Trunks are defective and do not open as wide as advertised; failing to adequately disclose the true characteristics and defective nature of the Smart Trunks; failing to adequately remedy the defects; and failing to provide refunds or restitution when repairs fail to remedy the defects.

257.    Upon information and belief, Defendant engaged in the foregoing conduct in order to enrich itself at the expense of the Plaintiff and Subclass Members.

258.    As the proceeds from the sale of Defendant's Smart Trunks were obtained/induced by improper means, Defendant is not legally or equitably entitled to retain these proceeds.

259.    Defendant breached the public trust through its misrepresentations, omissions, and other deceptive, unfair, and unconscionable conduct connected to the sale and repair of its Smart Trunks, all of which was to the detriment of Plaintiff and Subclass Members.

260.    By its actions in taking and withholding the Smart Trunk sales proceeds, Plaintiff and Subclass Members conferred, and continue to confer, a benefit upon the Defendant, and the Defendant is aware of such benefit.

261.   By Defendant taking and withholding Plaintiff's and the Subclass' monies, Defendant was and is financially unjustly enriched, causing an economic detriment to the Plaintiff and the Subclass.

262.   Defendant's retention of this benefit violates the fundamental principles of justice, equity, and good conscience.

263.   As it would be unjust and inequitable for Defendant to retain its ill-gotten gains, Defendant is required to pay restitution to Plaintiff and the Subclass.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Class Members pray for relief as set forth below:

A.   Certifying this matter as a class action on behalf of the proposed Class and Subclass, and appointing Plaintiff as class representative and the undersigned counsel as class counsel.

B.   Issuing a class-wide judgment that Defendant's conduct as described herein violates applicable laws including the California Unfair Competition Law, False Advertising Law, and Consumer Legal Remedies Act; Pennsylvania express and implied warranty statutes; the Magnuson-Moss Warranty Act; and the equitable theory of unjust enrichment.

C.   Awarding restitution and/or actual, incidental and consequential damages, and such other relief as provided by the statutes cited herein;

D.   Awarding punitive damages, as may be appropriate and permissible under applicable law;

E.   Awarding pre-judgment and post-judgment interest;

F.   Requiring restitution and/or disgorgement of all of Defendant's ill-gotten gains;

G.   Awarding attorney's fees and costs;

H.   Issuing an injunction against Defendant, its affiliates, successors, transferees, assignees, and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from in any manner continuing its unfair, unlawful, and deceptive practices and false advertising.

I.      Granting all other relief to which Plaintiff, Class Members, and Subclass Members may be entitled at law or in equity

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury for all issues so triable.

DATED: September 28, 2016              Respectfully submitted,

/s/ Noah Axler
Noah Axler (PA I.D. No. 85324)
Marc A. Goldich
**AXLER GOLDICH LLC**
1650 Market St., Suite 3600
Philadelphia, PA 19103
Tel: (267) 207-2920
E-mail:
naxler@axgolaw.com
mgoldich@axgolaw.com

James C. Shah
Natalie Finkelman Bennett
**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
475 White Horse Pike
Collingswood, NJ 08107
Tel: (856) 858-1770
Fax: (866) 300-7367
E-mail: jshah@sfmslaw.com
nfinkelman@sfmslaw.com

Robert P. Cocco
**ROBERT P. COCCO, P.C.**
1500 Walnut St., Ste. 900
Philadelphia, PA 19102
215-351-0200
Fax: 215-261-6055
E-mail: rcocco@rcn.com

*Counsel for Plaintiff and the Class*